All right we are now going to move to case number two of the morning Julius Evans versus Alex Jones. This is appeal number 19-3466 and Ms. O'Connell will begin with you. Good morning, may it please the court, I'm assistant attorney general Erin O'Connell on behalf of the respondent warden. This court should reverse the district court's grant of habeas relief on petitioner's Darden claim because it violated three principles that constrain federal court's review of state convictions on habeas. The court failed to defer to a reasonable interpretation of the record by the state appellate court. The court granted habeas relief where the state court's merits adjudication did not amount to an unreasonable application of Darden. And third, habeas relief should have been barred under the Brecht standard because there was no substantial injurious effect on the verdict. I'll start first with the factual determination because that was where the Illinois appellate court focused its express reasoning. So in this case the court construed the record and found that trial testimony supported the prosecutor's rebuttal closing argument that state witness and jurors recanted under circumstances that came from the witness to a gang murder and specifically this was illustrated through the fact that he had been interviewed by an investigator who had been hired by petitioner's co-defendant, in this case Mario Young. Testimony at trial showed that both parties when they questioned Jeffers shared the fundamental premise that the perpetration had taken place and that the identity of the person that Jeffers had spoken to was Mario Young's investigator. Ms. O'Connell, therefore is it the state's position that Chief Judge Pallmeyer just missed that aspect of the transcript connecting Young with the investigator? Is that the state's position? So the court did carefully construe the record, but I think what went wrong here was that the record is susceptible of multiple interpretations, which means that the state appellate court's reading of the record should not have been rejected unless it was objectively unreasonable. So the court disagreed with the interpretation of the record of the state appellate court. Their disagreement should not be enough to grant habeas relief. It actually has to be an objectively unreasonable reading of the record. And here there was enough in the record for the state appellate court to make that reasonable determination. And that is based on the questioning, the shared premise that this was Mario Young's investigator. And then more generally, there was additional evidence in the record that supported not only that conversation, but the fact that the recantation was a result of this sort of inherent intimidation that an eyewitness to a gang shooting will often feel being known to be such. And he continued to live in the neighborhood at the time of trial. Is it your argument that the district court here did its own de novo review and should have given deference to the state court and kind of flipped it and did the de novo review first? So I think the court certainly referred to the principles that federal habeas review, but I think on a reading of the court's decision, it did seem to amount to more of a de novo review of the evidence that was in the record on this Mario Young point. And I also stress that the district court actually found that much of the inference prosecutor was reasonably based on a trial testimony. So the district court acknowledged that there had been this meeting with an investigator and ultimately where the district court parted ways was with the prosecutor's attribution of that investigator to Mario Young. District court was correct that up to that point, the state appellate court's interpretation was reasonable, but it also should have gone on and found that this reference to Mario Young was also supported by the trial testimony. Because the parties had shared this premise that this was the nature of the meeting with the investigator. And I would also stress the sort of circumstances here, making clear the intimidation, certainly Jeffers' trial testimony sort of speaks for itself. Jeffers didn't just deny that he had seen what he had seen and that petitioner was the person who shot someone on the sidewalk next to him. He went and he denied that he had these meetings with prosecutors and the detectives. He denied that this was his written statement that he had signed. When he showed photographs he had identified, he denied that those were his initials. Extremely difficult witness in all respects. So ultimately, I think this is highlighted by a moment where he refused to even put his initials on a diagram that showed where he had been standing. Basically saying, I don't, I don't want to be part of this. I don't want to acknowledge where I was at the time of the shooting. So he did, in a very incredible way, disavow not only his own observations, but also just, he showed his fear and his unwillingness to give testimony, even to the extent of admitting his own prior conversations here. So that, too, supported the prosecutor's closed argument in rebuttal, where he stressed that the reason that this witness had recanted was intimidation that he felt as a result of being the eyewitness to the game shooting. But what would have linked that intimidation to Mario Young's investigator? So, the prosecutor. Because I think that's what the district court was focused on, that maybe the conduct and the disavow and the complete uncooperativeness while testifying, there could be an inference that he felt intimidated or didn't want to testify against a gang member or a friend. But what's the link to he didn't want to do that because the investigator came or Mario Young's investigator came? So, if the question is what evidence was there that this was Mario Young's investigator, it was implicit in the questioning. So, the prosecutor referred to a conversation. Jeffers denied that any conversation had taken place. The prosecutor specified this was a conversation with Young's investigator. When the defense counsel then got up, the defense counsel corrected Jeffers' testimony and said, well, it was a conversation, it wasn't there. And in doing so, and Jeffers admitted that there was, the defense counsel also referred to this person as Young's investigator. Ms. O'Connell, you're referring there to volume two of the transcript, I believe, page I, 174 to 176, is that right? The examination by defense counsel on recross? Correct. So, that questioning and that implicit premise in his question was acknowledged by Jeffers when he admitted that this conversation had taken place. And he didn't dispute at that time that this was Young's investigator. He ultimately backtracked when pressed further and denied knowing who the person was. But the prosecutor, based on the record and the testimony, could believe that Jeffers had, you know, acknowledged this premise that his meeting had been with Young's investigator. So, that's the evidence. And it's true that Jeffers, as he was generally in his testimony, was difficult to pin down on this point as well. So, ultimately, the most important point is that Jeffers did admit that this conversation had occurred. A conversation he initially falsely denied when questioned by the prosecutor and then ultimately admitted was the case when he was then corrected by defense counsel. And then again, when the prosecutor got up after that and asked him again, he continued to discuss and acknowledge that there had been a conversation and then disputed various aspects of it, where it had taken place, etc. But he continued to acknowledge that what everyone knew was a conversation with an investigator. And both parties had characterized as an investigator hired by Young. Finally, the evidence here, regardless of whether this court would reach the conclusion on a de novo review of the record, if there was enough there for the state of the court to reasonably conclude that there was testimony in the record that supported the prosecutor's inference. I'd also like to move on to Darden himself, which is the relevant Supreme Court precedent here governing petitioner's claim. Darden set forth the principle that improper closing argument can violate due process. In doing so, it set the bar extremely high. And in Darden, the prosecutor gave blatantly improper remarks that the Supreme Court criticized at length as improper. Nevertheless, even in the face of such clear misconduct, found that there was not a due process violation. And among other things, the court noted that jurors had been instructed by counsel that were not supported by evidence in the case should be disregarded. Here as well, the court admonished jurors before closing argument started, admonished them at least once during closing argument, that it should reject interpretations of the record offered by counsel that were not supported by evidence in the record. Those sorts of instructions cured any potential prejudice in Darden. Certainly, they cured any potential prejudice here where we do not have the sort of egregious misconduct or flagrantly improper remarks. We have at most what the court determined was a somewhat questionable or tenuous link in the defense investigator to Mario Young. But that was a minor error by comparison to Darden. And the district court should have found that it was not an unreasonable application of that clearly established Supreme Court precedent. Ms. O'Connell, you're into your rebuttal time. Would you like to reserve or continue? I'll reserve the remainder of my time. Thank you, Ms. O'Connell. Mr. Schneider, we'll move to you on behalf of the appellee. Thank you, Your Honor, and may it please the court. The district court correctly found that the prosecutor's improper assertions of facts not in evidence in his rebuttal argument deprived Mr. Evans of his constitutional right to a fair hearing. And the state court's rejection of that claim was based on an unreasonable interpretation of the facts. In reaching that conclusion, the district court accorded appropriate deference to the state court, and its fact-bound decision properly recognized that there were no facts and evidence showing that an investigator employed by Mr. Young visited Jeffers and intimidated him into recanting his prior statements. Mr. Schneider, I know the transcript here is confusing. And I think the area of the transcript that Ms. O'Connell is referring to about the connection between Young and the investigator is at that citation I gave earlier, transcript volume 2, pages I-174 to 176. And just please bear with me while I repeat some of the questions and answers, because I'm interested in your thoughts on them. The question posed was, the state's attorney just asked you if you spoke to an investigator for Mario Young when you were released from custody. Is that correct, sir? Then the answer from Mr. Jeffers is, when I was released from custody. That could be, I suppose, interpreted as an interrogative sentence or a declarative sentence. Next question, right when you were out. Answer, right. It strikes me that that's the area that the state is arguing connects the two, that although Mr. Jeffers was certainly testimony weaved throughout the hearing, that area would have been sufficient for purposes of the questioning whether or not Young had retained the investigator. What are your thoughts on that? My thoughts are the following, Your Honor. First, I agree that that is the only hint in the record that would be a basis to make the argument that the prosecutor sought to make. I don't agree that it is ambiguous in any way. I would say three things. First, that question is simply an acknowledgment that the question had been posed to him by the prosecutor in the direct examination. There's nothing about the question or the answer that concedes or suggests an answer to the prosecutor's underlying question. That is how cross-examinations happen every day in which counsel say to the witness, do you recall being asked this question? The witness says, yes, I recall the question. And then the lawyer moves on with the question. There's nothing about the answer or the question that suggests that Jeffers was changing his answer to the question that had been posed to him. Secondly, even in argument today, the states characterize this in a very fluid way. She's described it as a shared premise, as implicit in the questioning. There's nothing about kind of assumptions in an attorney's mind or the personal knowledge of a prosecutor that is a fact in evidence as something to argue in closing. There was no stipulation on this point. It was never agreed to. It was at best sort of a theory that the prosecutor sought to advance. And third, to the extent there is something unintelligible or ambiguous about this question, Mr. Jeffers was asked the question in an unambiguous way at least five times by the prosecutor. And I'll just cite an example or two of that, Your Honor, in which he says, when you were released from boot camp, you got a visit from someone working for Mario Young, the code defendant, didn't you? Answer, no. Question, didn't an investigator working for Mario's lawyer come to your home and ask you questions about what happened and talk to you? Answer, no. But you know it was an investigator who worked for Mario Young, the defendant in this case, didn't you? Answer, no. You didn't know that? No. Who did you think it was? I don't know who it was. That was the testimony, Your Honor. And the prosecutor had a theory that he wanted to be able to argue. He asked the right question to try to elicit a factual basis to be able to make that argument. But he got the wrong answer to that question repeatedly. And what he did is just forge ahead with the argument anyway in closing. Mr. Schneider. Go ahead. Go ahead. I want to go back and pick up on Judge Brennan's question, please. After the testimony that Judge Brennan just identified, the defense lawyer asked the question immediately afterwards, and did you tell them, did you stick with the story with that investigator? Referring back to the premise, arguably one interpretation of it, that that investigator was the investigator for Mario Young in his prior question. Why couldn't an interpretation of that be that he met with that investigator, namely the investigator for Mario Young? I understand your response to Judge Brennan's question, that first question, was merely a reiteration of the question, a drawing of attention to the question. But when he went on to refer to that investigator, there wasn't anything qualifying about it. So why couldn't one reasonable interpretation be what the state court interpreted it as? For two reasons, Your Honor. First, the defense lawyer in asking those questions explicitly did not reference who the investigator worked for. He was generic and said that investigator. But that investigator, he didn't say the investigator or a investigator. He said that investigator, referring back to his prior question, namely an investigator for Mario Young. Why couldn't that be a reasonable interpretation? Because that investigator refers back to the question that was asked of Mr. Jeffers before, in which he denied knowing who that person was. It's clear that he was. No, he had not denied knowing. At this point in time, he had not denied knowing. This is the defense lawyer asking him the question, not the series of questions that you just went through where the prosecutor asked him the question. Well, he had never he had denied that testimony before. So there was no I mean, there was there's no question that he spoke to somebody. We have no basis for what it for who that person is. And there's nothing about kind of the term that investigator, that person that provides the linkage, which this entire, you know, argument depends on to to Mario Young. Mr. Schneider, you've answered our questions directly, and I want to thank you for that. I want to shift to another area of the transcript on this topic. Obviously, there's two issues. There's the use of the phrase gangbanging, and then there's the one we've been discussing here, the connection between Young and the investigator. And there's a certain amount of deference, obviously, we've got to give to the trial judge here. And I'm referencing supplemental appendix pages 52 to 59. And the transcript pages are I-187 through I-194. And this is the closing argument. And during the closing argument, the prosecutor is making obviously making the presentation, and there are objections from the defense counsel and the trial court's ruling on those objections. I found it looks like at least three instances where when the prosecutor argued that the Young-investigator connection had resulted in a change in Mr. Jeffers' testimony, that the trial court was overruling those objections. I'm on page SA-52, SA-54, and SA-56. Now, there are instances where the trial judge sustained the objection. Those, however, were to questions where the use of the word gangbanger was included. And what I'm wondering here is whether the trial judge, based upon the record, felt a sufficient comfort with the argument that was being offered by the prosecutor that the Young-investigator was the reason for the change testimony, but that trial judge did not feel comfortable with the use of the phrase gangbanging. What are your thoughts on that? I don't think we know, Your Honor, because the trial court gave no explanation for the objections that he provided. And the links to Mr. Young's investigator were the objections that he consistently overruled. There was a second claim on habeas in the district court related to gang-related arguments that is not now before the court. I think the central issue here is the prosecutor's assertions that Jeffers was intimidated based on the linkage to Mr. Young, which was clearly the theory in the prosecutor's mind, but there wasn't a factual basis in the record to make that argument. And with respect— Mr. Tiger, do you think there was enough in the record if the prosecutor had argued that Jeffers was interviewed by a defense investigator and just didn't identify Mario Young? No, I don't, Your Honor. I don't think that was established either. We know someone talked to him. It could have been a neighbor. It could have been someone from the state's attorney's office. We have no ability to know that at all. And what I would say, Judge, is that in a case like this where the evidence is so tenuous— I mean, if you were designing a case to test the limits of constitutional sufficiency, this would probably be it, where you're convicted based on the testimony of a single out-of-court identification a year after the fact of somebody in a car in a drive-by shooting by a jailhouse informant that everyone agrees is low credibility and using kind of fairly dubious identification techniques. In that situation, any misstatement of the evidence or assertion of facts not in evidence is going to have an outsized effect on prejudice. Is there anything in Darden that says that we should look at that or factor that in? Yes. This Court has said that the most important factor under Darden is the weight of the evidence. There are other factors that weigh in as well, including just the inherent inflammatory nature of an intimidation argument, particularly in the gang context, the fact that the argument was held for rebuttal. But this Court has said very clearly in cases like Kobe Anderson that the weight of the evidence is the most important factor in evaluating a Darden claim. And I think that's especially true here because this wasn't— you know, it was not a stray comment. It wasn't a stray inflammatory comment. It was an argument that the state's case depended upon. They had to have an explanation for Mr. Jeffers' testimony in court. The prosecutor knew that. He asked the questions repeatedly to try to make the argument that Jeffers had been intimidated by an investigator for Mr. Young. He asked that five different ways directly. And in each case, Mr. Jeffers testified to the opposite. And after he got the testimony that was not consistent with his theory, he just made the argument anyway. And that is kind of textbook improper argument under cases like Berger. And I would just say, you know, with respect to the Brecht arguments, I don't think there's really any daylight between prejudice for purposes of Darden and Brecht. You know, the court has held or the circuits have held, for example, in the Strickland context that if you find Strickland prejudice, there's no need to do a separate Brecht analysis. And I think if you find prejudice for purposes of Darden, there's really no daylight between. If we decided that the Brecht case had to be applied, could we apply it here or would we have to remand? You could apply it here and the result would be the same as Chief Judge Meyer's decision. For the reasons I've identified, which is that they're clearly given the tenuous weight of the evidence here, a substantial and injurious effect on the outcome. Anything further, Mr. Schneider? I would just say in closing, Your Honor, this is, you know, this error has been described as a micro error. We could not disagree more strongly with that characterization. This was a case of extraordinarily weak evidence. It's a case in which the prosecutor had a theory that he sought to advance, in which he failed to elicit the evidence that he needed to make the argument. And he just went ahead with the argument anyway. And that is, you know, not an appropriate argument. It's an argument, particularly in facts like this, that is rated with prejudicial potential, particularly where there are lots of other indicia, as there are on the record here, of deep problems with the government's proof. The district court's decision here was thorough. It was well-reasoned. It gave deference to the state court. And it was, as one would expect for a 2254 D2 claim, very detailed and fact-bound. And so we would ask that this court confirm the decision of the district court. Thank you, Mr. Schneider. Ms. O'Connell, rebuttal. Thank you. I did want to call the court's attention to the trial court's rulings on the objections during closing argument. There is an important moment in the supplemental appendix at 52-53. The court overruled objections where the prosecutor linked this investigator to Mario Young, suggesting that that was supported by the testimony. There is a moment in the argument where the prosecutor became imprecise and attempted to attribute the investigator to both Young and Petitioner, referring to them and the investigator working for them. When Petitioner objected to that characterization, the trial court did sustain the objection, making clear that the court thought the evidence did link this investigator clearly to Young. The evidence was not there to clearly link it to Petitioner. So I would just note that. So just a brief statement on the evidence. Counsel sort of understated the state's case here. This was not a single identification out of court by a jailhouse informant. This was not just an eyewitness, but a potential victim to this crime who had been standing in the area where the gunshots had been aimed. He did not identify Petitioner and Young a single time. He identified both of them four times. He identified them at the time that he was visited in boot camp, and he provided their written statement, signed the backs of the photographs. He testified to a grand jury after making a lineup under oath, identifying both men as participating in the shooting. Petitioner, of course, is the one who actually fired the gun, and then Young as a passenger in the vehicle who sort of facilitated the shooting by moving forward. What we have here is a consistent identification outside of court, but then relative safety in state custody. Then we have the recantation that occurred after he was outside of the safety of state custody and was again on the street where he lived near this gang turf war. He recanted and his testimony showed that his recantation was not credible in comparison. It's not equally weighed that we have the out of court identifications, and we have the trial testimony on one hand and the testimony, the recantation on the other. Clearly stronger evidence in the form of these consistent for identifications of Petitioner and Young and his trial testimony recanting those observations and his identifications was not equally credible. So for that reason as well, there was no prejudice here because the jury would have credited the out of court identifications over the trial testimony recantation, regardless of the closing arguments. We ask for that reason as well, that this court reversed the grant of habeas relief in this case. Thank you, Ms. O'Connell. Judge Ripple, any further questions? No, thank you. Judge St. Eve. No, thank you. Thank you to both counsel and Mr. Schneider. I want to thank you on behalf of the court for your work on this case. I understand you were appointed by the court and you go with our great thanks. Thank you, Your Honor. The case will be taken under advisement.